**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION,et al                    Civil Action
                                             No. 1:22-3186
                Plaintiff,

       vs.

U.S. DEPARTMENT OF HOMELAND                  February 22, 2024
SECURITY,                                    1:20 p.m.

                Defendant.                   Washington, DC
_____

                TRANSCRIPT OF MOTION HEARING
        **BEFORE THE HONORABLE CARL J. NICHOLS**
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For Plaintiff:**              **Eric Neal Cornett**
                                LAW OFFICE OF ERIC NEAL CORNETT
                                70 I Street S.E., 525
                                Washington, DC 20003
                                606-275-0978
                                **Samuel Dewey**
                                CHAMBERS OF SAMUEL EVERETT DEWEY
                                2200 12th Court North, Apt. 609
                                Arlington, VA 22201
                                703-261-4194

**For Defendant:**              **Fithawi Berhane**
                                Fithawi Berhane
                                U.S. ATTORNEY'S OFFICE
                                601 D Street NW, Suite 7-210
                                Washington, DC 20001
                                202-252-6653

**Reported By:**                **LORRAINE T. HERMAN, RPR, CRC**
                                Official Court Reporter
                                U.S. District & Bankruptcy Cts.
                                333 Constitution Avenue NW
                                Washington, D.C. 20001
                                lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1                      **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  Good afternoon, Your Honor.  This

3    is civil case year 2022-3186, *Heritage Foundation, et al,*

4    *versus U.S. Department of Homeland Security.*

5          Counsel, please come forward and introduce

6    yourselves for the record, beginning with the plaintiffs.

7          **MR. DEWEY:**  Samuel Dewey for the plaintiffs, Your

8    Honor.  With me are co-counsel Neal Cornett and client

9    representative Kyle Brosnan.

10          **THE COURT:**  Good afternoon.

11          **MR. DEWEY:**  Good afternoon, Your Honor.

12          **MR. BERHANE:**  Good afternoon, Your Honor.  I'm

13    AUSA Fithawi Berhane.  I go by Isaac and I'm for the

14    defendant.

15          **THE COURT:**  Mr. Berhane.

16          **MR. BERHANE:**  Correct.

17          **THE COURT:**  Good afternoon.

18          So we're here on the parties' cross-motions for

19    summary judgment.  I've read all of the materials.  And I

20    have some relatively specific questions for both sides but I

21    think primarily for the government.

22          So why don't you come up, Mr. Berhane.

23          From my perspective, at least as it relates to the

24    adequacy of the government's search, I think the primary

25    issues in dispute can be contained or can be found in

1    plaintiffs' Reply, which is the ECF No. 19.

2              And so, I have a series of questions about them.

3    Recognizing that the request here is actually pretty broad,

4    you know, a number of different topics, my first question

5    is, Why is it reasonable to assume that responsive records

6    would have been found really only at OLA or OI?

7         **MR. BERHANE:**  Your Honor, I think the rationale of

8    the government conducting the search and limiting it to

9    those two program offices was simply that, as we explained

10   in our declarations and our briefing, any responsive records

11   related to the incidents that the FOIA requests arose from

12   would have been -- those documents would have been created

13   within those program offices.

14        **THE COURT:**  But so -- that's what I don't

15   understand.

16             So, for example, I don't know if this document

17   exists, but, if Secretary Mayorkas took notes of a

18   conversation he had with the Department of Justice or the

19   White House or OIG, why would those notes be found in OLA or

20   OI?

21        **MR. BERHANE:**  So, Your Honor --

22        **THE COURT:**  Or what if he had email exchanges or

23   communications with those offices?

24        **MR. BERHANE:**  Your Honor, I believe, under the

25   FOIA, I think our -- at least as I understand the governing

1      law and the rationale of the agency, our obligation is to

2      search for any location reasonably likely to yield

3      responsive records to the FOIA requests.

4             I suppose we could always do a more -- a broader

5      search to make sure we get every single potentially

6      responsive record, but I believe that's not exactly the

7      standard under the FOIA.

8             **THE COURT:**  But you actually say something much

9      broader than that or starker.  You say, "Any such

10     records" -- this is Page 7 of your Reply -- "would

11     necessarily have originated in OLA and OI Program and would

12     have been produced pursuant to the searches of those program

13     offices."  That's a different argument.

14            But would you concede that -- put it this way,

15     anyone in the Secretary's office who is communicating with

16     anyone about these incidents or at least an investigation of

17     these incidents but not copying OLA or OI, that these

18     searches wouldn't capture those communications?

19            I can make it real easy, if the Chief of Staff to

20     the Secretary was communicating about these incidents or the

21     investigations about these incidents either in email -- so

22     we're talking about the actual communications -- or phone

23     calls but taking notes of those calls, those records would

24     not be found in a search of OLA and OI, unless it turned out

25     that OLA was copied for part of the communication or if it

1   turned out that, for some reason, those communications made

2   their way into the OI files.

3          **MR. BERHANE:**  Okay, Your Honor.

4          So I would -- I think, Your Honor, that that is

5   potentially a reasonable assumption.  But I don't want to

6   commit the agency to that.

7          **THE COURT:**  I mean, let's maybe be even more

8   specific.  Okay?  Topic 7 says, "All communications with the

9   Department of Justice relating to the incident."

10         Topic 8 says, "All communications with the Office

11  of the President or Executive Office of the President

12  relating to the incident."

13         Why is it reasonable to assume that all

14  communications between the department, I mean DHS, and

15  either DOJ on the other hand or Office of the President or

16  Executive Office of the President on the other hand, would

17  run through OLA or OI?

18         I mean, honestly it's not.  It's not plausible.

19  It's not plausible to think that they would be 100 percent

20  captured through a search of OLA and OI.  I mean,

21  communication between the Chief of Staff of the DHS and DOJ

22  might be copied to OLA, but there's no reason to think it

23  necessarily would or at least the declarations don't

24  establish that proposition.

25         And, frankly, communications between the White

1    House and the department -- I mean the Department of

2    Homeland Security -- at least, in theory, you're supposed to

3    follow certain protocols, and it's not clear to me that they

4    would be copied to OLA and/or OI in all circumstances.

5            So the part of the brief and the declarations that

6    I don't find adequate is the -- is demonstrating that

7    materials that I've just articulated would necessarily be

8    found in OLA or OI.  So do you have a response to that or

9    are you just kind of relying on the agency on that one?

10    **MR. BERHANE:**  In all candor, Your Honor, I don't

11    have much to add beyond what's in the declarations.

12    **THE COURT:**  Okay.  So now let's turn -- so one

13    thing we're going to do at the end of the hearing is discuss

14    whether the department -- I mean the defendant department

15    here, not DOJ, DHS -- wants to give it another shot.

16    **MR. BERHANE:**  Okay.

17    **THE COURT:**  So one thing I'm going to have you

18    take back is whether, in light of my significant doubts that

19    the record reflects that all of these documents would

20    necessarily be captured in an OLA and OI-only search,

21    whether the department wants to take another shot.

22            Okay.  So now the next topic is -- and I'll hear

23    from plaintiffs' counsel on this one.  I mean, in theory,

24    not just DHS leadership could be engaged in these kind of

25    communications, but it sounds like plaintiffs' primary

1     argument is that, once you expand the search beyond OLA and

2     OI, the primary place the department should have been

3     searching was leadership.  And so it may be that that's

4     really the question is whether the department is willing to

5     expand the search there.

6          Okay.  Now the next, plaintiffs' next concern is

7     about the use of the conjugates of the word "whip".  And as

8     I read the declaration, the second declaration, the

9     conjugate was used.  So it includes -- so the search would

10    pick up more than just "whip".  It would include "whipped"

11    or "whipping" or something like that.

12         But at least, from plaintiffs' perspective, they

13    read, plaintiff reads the declaration as saying, Well, the

14    conjugate was used only in some but not all of the searches.

15    Are they right about that?

16         **MR. BERHANE:**  I did not read the declaration to

17    say that.

18         **THE COURT:**  Okay.

19         **MR. BERHANE:**  In my communication -- well, I

20    shouldn't divulge that -- I'll just --

21         **THE COURT:**  You believe, standing here today, that

22    the conjugate was used any time the word "whip" was used?

23         **MR. BERHANE:**  That's my understanding, Your Honor.

24         **THE COURT:**  Okay.  So that's one where I might

25    need some clarification because I think plaintiffs' primary

1    argument there is that, Yes, the conjugate should be used

2    and it's just not clear that it's used throughout.  Okay.

3            Now, "migrant" and conjugates, which is

4    Argument 3, this is see Page 15 of the reply brief.  I

5    understand the government's argument here.  But one question

6    I just want to make sure I understand, let's just use a

7    typical email search using search terms.  Did the department

8    run searches that were disjunctive or conjunctive?

9            **MR. BERHANE:**  Your Honor, that's a -- I want to

10   say that's clarified in the declaration but I couldn't tell

11   you.

12           **THE COURT:**  Here's why it matters.  If they're

13   disjunctive, such that an email that has any of the search

14   terms will pop up as potentially responsive, then adding

15   "migrant" means that any email that uses the word "migrant"

16   but has no other connection to this matter would pop up.

17   And that could be, like, every email under the sun.

18           If they're conjunctive, then -- well, I'm not sure

19   that's great either because maybe that's too limiting a

20   search.  But I need to sort of understand.  Do you have an

21   understanding of how the department employed its searches in

22   this sense?  By the way, it doesn't have to be conjunctive

23   or disjunctive.  It could be a combination of both.

24           **MR. BERHANE:**  Yeah, Your Honor, I want to -- I

25   don't want to commit the agency to any particular answer

1    here.  I would think that --

2            **THE COURT:**  So here's the thing.  This is a

3    summary judgment argument.

4            **MR. BERHANE:**  Yeah.

5            **THE COURT:**  You need to know the answers to these

6    questions or you need to have somebody from the department

7    here who can answer the questions.  I mean, I am asking

8    pretty basic questions about the search.

9            And no one is telling me, Was it conjunctive?  Was

10   it disjunctive?  No one's here to answer the question, Well,

11   why is it exactly that the OA would capture -- or OI would

12   capture all of the documents?

13           Okay.  So you don't know on that one.  Let's just

14   go to the last argument from the plaintiff that turning to

15   email inboxes of OI employees should have been searched and

16   you didn't do that.

17           **MR. BERHANE:**  In terms of individual employees,

18   yes.  And my understanding from the agency is that, while

19   individual email boxes were not searched, a location was

20   searched where those -- any responsive emails would have

21   been in that location.

22           **THE COURT:**  Well, it's phrased as "all relevant

23   investigative emails."  That's what the declaration says and

24   I don't know what that means.  I don't know what "relevant

25   investigative emails" says; and that is a potentially

1   narrower interpretation of the request than the request is

2   phrased as.

3           I mean, the request doesn't say "investigative

4   emails."  The request says, for example, "records relating

5   to" or "records relating to examination, records of the

6   examination, records relating to declination."  That's

7   broader, potentially broader than all relevant investigative

8   emails, depending on what that means.

9           I mean, for example, what if two OI employees were

10  emailing back and forth about the declination or the

11  possibility of a declination by DOJ to prosecute border

12  patrol agents?  Would that be considered -- just emails

13  between those employees, would those be considered all

14  relevant investigative emails?

15          **MR. BERHANE:**  I would think that that should be

16  included.

17          **THE COURT:**  But do you know?

18          **MR. BERHANE:**  I'm sorry.  I'm sorry, Your Honor.

19  I'd have to --

20          **THE COURT:**  Okay.  So obviously I've been focused

21  on the adequacy of the search because then, if, as and when

22  the search is adequate, then you have a universe of

23  documents as to which there are exemptions asserted clearly,

24  and then argument about the exemptions, if we get to the

25  point where the Vaughn index is adequate and the like.

1          I don't want to turn to the Vaughn index yet

2     because I want to just stay on this adequacy question.  So

3     why don't I hear from plaintiffs' counsel and I'll let you

4     have an opportunity to rebut anything you hear you'd like to

5     respond to.

6          So, Mr. Dewey, do I have your general positions

7     basically right?

8          **MR. DEWEY:**  You do, Your Honor.  You've summarized

9     them.

10         **THE COURT:**  Okay.  Do you want to walk me through

11    anything that you think I missed or particular highlights?

12         **MR. DEWEY:**  I think, to be helpful to the Court, I

13    would just point out you have our argument on the first

14    point as to the scope of the search.

15         **THE COURT:**  Right.

16         **MR. DEWEY:**  And I think it's also significant that

17    this is actually one of four cases Your Honor has in front

18    of you arising out of this incident.  There's an original

19    request to DHS, this request to DHS OIG, a follow-up request

20    to DHS and then a request to the department, and this is the

21    only request where we've had this issue.  And productions

22    from the original case are in front of Your Honor and

23    demonstrate, there, we have not completed production.  But

24    we've had no issue like this in terms of cabining the search

25    to certain areas.

1              As to your question about the challenge to the

2      adequacy of the search, Your Honor, and what we're looking

3      for, based on our view of the org chart, which is reproduced

4      at Page 10 of our opening brief, the issue is the search of

5      leadership; and that's the issue.  We think that leadership

6      may well have documents, as Your Honor has articulated

7              **THE COURT:**  When you say "leadership," who do you

8      mean?

9              **MR. DEWEY:**  So the org chart on Page 10 of our

10     opening brief, Your Honor, it's probably the best way to

11     look at it.  And this is --

12             **THE COURT:**  Give me one second.  I have all but

13     that brief printed which is my fault.  I can pull it up very

14     quickly.  Just give me one second.

15             **MR. DEWEY:**  Certainly, Your Honor.

16             Your Honor, I have a clean copy.  If that would be

17     helpful, I can tender.

18             **THE COURT:**  That would be great.  Thank you.

19             **MR. DEWEY:**  Our issue is confined to everything

20     above the red line.  So it would be IG Cuffari, his deputy,

21     the chief counsel, those offices, the IG's leadership team

22     as opposed to a program office.  We have no reason to

23     challenge the adequacy of the search on the information we

24     have as to other component offices.

25             **THE COURT:**  Right.  And to some extent, my

1   questions earlier were obviously broader in a sense because

2   your request is posed to the IG's office rather than to DHS

3   generally.

4        But I think all of my questions still stand, which

5   is to say, Why, for example, would a communication between

6   the Inspector General himself and Secretary Mayorkas about

7   this incident have necessarily -- to use the word in the

8   government's brief -- copied OLA or OI or made its way into

9   the OLA file.  It may have.  I'm not suggesting -- perhaps

10  they often did, but I don't think, without more, that I can

11  conclude that that was always the case.

12       **MR. DEWEY:**  Absolutely, Your Honor.  I agree with

13  you on all of that.  In every example that you've discussed,

14  it would apply.

15       **THE COURT:**  Right.  I mean, whether a

16  communication between Secretary Mayorkas and the DAG would

17  make its way into the IG's files, that's another question.

18  But there's no reason to believe that a conversation or a

19  communication between Secretary Mayorkas and the DAG would

20  have copied OLA.

21       **MR. DEWEY:**  Correct, Your Honor.

22       And there's no reason to believe a conversation

23  between the IG and the DAG, which, as Your Honor knows,

24  sometimes can occur.

25       **THE COURT:**  Yeah.

1          **MR. DEWEY:**  If the IG's talking with the

2    department, he's probably calling the DAG.

3          **THE COURT:**  Right.

4          **MR. DEWEY:**  That would apply, I think, *mutatis*

5    *mutandis* in this instance.  So Your Honor completely has our

6    argument there.

7          If I can be helpful to Your Honor on the search

8    point and the conjugates issue.

9          **THE COURT:**  Yes, please.

10          **MR. DEWEY:**  So in looking at both of the -- and I

11    apologize if I'm butchering the pronunciation -- the Chigewe

12    declaration.

13          **THE COURT:**  You notice I didn't attempt it.  I

14    just said the second declaration.

15          **MR. DEWEY:**  Looking at both of them, Your Honor,

16    and we'll start looking at OLA, as we understand it, there

17    were two different searches of OLA.  The first search -- and

18    this is the second declaration at 19, and the first

19    declaration at 26.

20          The first search was a search of Outlook, the

21    Share drive and the SharePoint database.  That search, it's

22    pretty clear, as we would submit from the second declaration

23    at 19 and 26, that they only ran "whipping".  I think 19 is

24    pretty much dispositive on this on the second declaration,

25    Your Honor.

1        The Office of Legislative Affairs used the

2  following search terms to pull potentially responsive

3  records:  "Whipping", "Haitian migrants", "Rio Grande River"

4  and so forth.  There is no conjugate of "whipping".  The

5  second search that was --

6        **THE COURT:**  While you're on that --

7        **MR. DEWEY:**  Certainly, Your Honor.

8        **THE COURT:**  -- I understand the conjugate

9  question.  What is your understanding about whether those

10  terms were employed in a disjunctive or conjunctive manner?

11        **MR. DEWEY:**  My understanding is that they were

12  employed in the disjunctive.

13        **THE COURT:**  Okay.

14        **MR. DEWEY:**  Based on conversations had antecedent

15  to the preparation of the declarations, there was a

16  discussion of search terms.  And I think, as Your Honor

17  noted -- and we appreciate the department for clarifying

18  that the conjugates were used in some searches.

19        There was some surprise and some of the

20  correspondence in the meet and confer is attached to my

21  initial declaration because, in the opening brief, we were

22  quite surprised because we had discussed that, had

23  understood the department would run it, and then there's

24  this issue.

25        But on that second search, Your Honor, which is

1    the OLA mailbox and, as I understand it -- and this is

2    probably the Chigewe Declaration at 20 that explains it the

3    best -- that mailbox is -- as Your Honor knows, many

4    agencies have kind of a generic correspondence box; that's

5    what that box is.  And that, the conjugate was run.  So as

6    we read the declarations now, we think it's pretty clear

7    that the conjugate was run in one instance but not --

8         **THE COURT:**  Sometimes but not others.  I

9    understand.

10        **MR. DEWEY:**  -- not in the others.  And I think

11   that is impermissible without more.  Certainly, it's

12   possible Your Honor accepted that, in one of the cases we

13   cite, when it was well-explaining why that was done.  But we

14   think here, at a minimum, there needs to be an explanation.

15        Unless Your Honor has any more questions on that

16   question, I'd go to the migrants point.

17        **THE COURT:**  Yeah.

18        **MR. DEWEY:**  I think Your Honor captured our

19   argument correctly.  We concede you run migrants, you're

20   going to get any number of records.  We would just --

21   advance in the argument is, there should have been some

22   consideration of running that term perhaps in conjunction

23   with others, perhaps on a very narrow date range.

24        We've certainly seen and, I think, everyone's

25   conducted searches where you come at it from several

1    different angles and you might use a broader term for a very

2    narrow temporal window or tied to another term that moors

3    it.

4           Our concern was "whipping", you know, was a very

5    good term.  It is a very good key term, it and its

6    conjugates, but it's certainly not potentially in

7    everything.

8           Unless Your Honor has questions on that, I can go

9    to the investigative email point.

10           **THE COURT:**  Yes, please.

11           **MR. DEWEY:**  So Your Honor did capture our

12    understanding as to what is an investigative email.  And our

13    view is that's particularly important because, as Your Honor

14    pointed out, we really don't know if emails are serialized

15    that don't relate to the investigation.

16           And we know from the production that there were --

17    the IG was testifying in front of Congress about this well

18    after the fact.  And this is in the production.  At 20 to 23

19    there's a discussion of his testimony.  We know that he took

20    congressional meetings.

21           There's material in the production at 24 and 30

22    about a meeting he took with Representative Roy.  One would

23    think those emails are not going to be serialized because,

24    to Your Honor's point, they don't relate to the

25    investigation.

1      And another point I would just make, Your Honor,

2  is that the search of the investigative system was cabined

3  from August 1st to October 30th.  That may well be

4  reasonable to search the investigative database to a

5  narrower point.  I don't have a leg to quarrel with that.

6      But our submission would be, certainly you should

7  search outside of that for the longer date period because

8  that's pulled in per our request and to go to the examples I

9  just ran you through, Your Honor, that's coming in June of

10  the next year.  So it's well after the cut-off; that just

11  wouldn't be pulled in.

12      If there was a tasking to OI, I need a memo stat

13  to prepare the IG for this meeting, those emails wouldn't be

14  captured as we understand it, just on the date range alone,

15  setting aside the serialization issue.

16      **THE COURT:**  Right.  I mean, just so I have it in

17  terms of the language that's being used, if in April of the

18  year following the incident the chief counsel in the IG's

19  office had communicated with OI about a congressional

20  inquiry, maybe staffing something up, I don't know, but

21  something that isn't an external communication that you

22  would think might go through OLA but is sort of an internal

23  Let's-figure-this-thing-out-need-your-help, that would be

24  outside the date range, at least when it relates to the OI

25  portion.

1          And it may or may not be an email of the -- in the

2     sense used by the government in the second declaration to be

3     an investigative email or what exactly the term was.  I

4     mean, it may just be an email.

5          **MR. DEWEY:**  It may just be an email.  Yes,

6     Your Honor.

7          **THE COURT:**  And I don't really know.  And then I

8     suppose, even if you had, for example, you eliminate the

9     date issue, if that same communication is within the date

10    that the government did search for, I don't know whether

11    that counts as a -- such an email or not.

12         **MR. DEWEY:**  Precisely, Your Honor.

13         **THE COURT:**  Yeah.  Okay.  So I have your position

14    on all four topics.

15         So here's what I want to do.  Thank you.  So this

16    is a message to the government.  This strikes me as, like,

17    woefully inadequate.  It's, like, apparent from the face of

18    the documents to me that the government's search wasn't

19    enough as it relates to the arguments 1 and 4.

20         Really, we're talking about A in plaintiffs' reply

21    brief beginning at Page 5 and D beginning at Page 15.

22    Different topics, different reasons.  But it seems to me

23    pretty clear that the government has not established that

24    documents responsive to this request -- and this is going to

25    A -- would necessarily be housed within OLA and OI for the

1    reason we discussed.

2              And then separately, as to OI, I just can't tell

3    whether, for example, a communication between the chief

4    counsel and OI would be considered something that's in the

5    file or is just an email.  And I don't know whether that

6    would be considered a relevant investigative email.  Those

7    are my views as to those two topics.

8              As to the use of the conjugate for "whip", whip

9    and conjugate, it seems to me that, everywhere the

10   government is doing an electronic search with search terms,

11   it should be using the conjugate of "whip".  And it is not

12   clear to me from the declarations that that is always true.

13             It may be.  It may be that the declarations are

14   just not clear enough on that point.  But that one, I think

15   it's clear to me that that should be the case.

16             And then on the assumption that all electronic

17   searches were done disjunctively, I think it's very likely

18   that the government can satisfy me that using "migrant" is

19   unnecessary because it would just expand the universe

20   hugely.

21             And the only thing the government might need to do

22   is to say, Well, look, using "migrant" would be incredibly

23   overbroad.  We thought about doing some conjunctive

24   searches, migrant and date, migrant and Haitian, I don't

25   know, migrant and something that wouldn't otherwise be

1    captured by the disjunctive searches, and we didn't do that

2    for the following reasons.

3           I don't know.  There may be a good reason for

4    that, but I certainly don't think it makes sense to search

5    for every email or every document that says "migrant".  That

6    makes no sense but it could possibly make sense to search

7    for migrant plus something else, just depending.

8           So here's what I need to have happen.  I need you

9    to -- well, I would like you, Mr. Berhane, to communicate

10   everything I just said, including my general negative

11   reaction to the efforts to date.

12          But much more important, just in terms of getting

13   this case moving to the next stage, I would like to know by

14   the end of next week, which is March 1st, basically answers

15   to the following questions which all flow from what I've

16   just said.

17          One, Is the government willing to search for

18   responsive records within the leadership offices identified

19   by plaintiff or at least something more than just OLA and

20   OI?  That's the first question.  Is it willing to do that?

21          Second, Is it willing to search within OI for

22   something other than relevant investigative emails, whatever

23   that term means, that is to say, search within OI for what I

24   consider to be sort of more traditional just emails?  That's

25   the second thing.

 1          Three, Did the government use "whip" and a

 2     conjugate in all searches?  And if so, I need a declaration

 3     saying that clearly.  And if not, is it willing to do so?

 4          And then the fourth question is, In light of my

 5     general view that "migrant" is not a particularly helpful

 6     disjunctive search term, does the government also believe --

 7     and I think I would ask for this to get articulated later

 8     after we, perhaps, do some work -- why it nevertheless need

 9     not be a conjunctive term in the specific circumstances of

10     this case with something else?

11          And the reason I say that, for example, is it's

12     hypothetically possible that someone sent an email that says

13     something like this:  Hey, can you help us figure out this

14     incident with the migrants?  Or something like that where

15     they're using, kind of, not the specific terms that are in

16     the disjunctive search.

17          I'm not suggesting that's likely.  I'm just saying

18     it's possible.  I just want to know from the agency why it

19     has decided that something like that wouldn't be helpful.

20     So is that clear enough, from my perspective, about what I'd

21     like you to do working with your client?

22               **MR. BERHANE:**  Yes, Your Honor.

23               **THE COURT:**  Okay.

24          So I want an answer to those things filed

25     March 1st.  And in the event that the government says that

1    it's willing to do some or all of what I, sitting here, sure

2    think it should be doing, then obviously, Mr. Dewey, you can

3    see whether, from your perspective, what the government

4    files is adequate.  It may not be of course.  I understand

5    that.

6         And I will look and decide for myself whether it

7    is and if I should, perhaps, get on the phone with everybody

8    and just understand it or whatever.  But I'll leave it to

9    you in the first instance to work that through with the

10   department.

11        So file something no later than March 1st on the

12   government's views on these four questions.  And then if it

13   means that there will be more searches and more productions,

14   we'll deal with it.  If it means there won't, then we'll

15   deal with that or if we're somewhere in the middle, we have

16   can fight about whether the middle is adequate for present.

17   Okay?

18        As a result of that, I want to see where we land.

19   And again, I hope you communicate back to your client that

20   this didn't satisfy me.  If we get to the point where the

21   proposed additional steps will satisfy me or at least

22   possibly, it may be that we have some additional production,

23   and then we get to the point where we have a more concrete

24   set of issues that aren't really about searches but are

25   about *Vaughn* and withholdings and we'll get there.  Okay?

1          Anything else we should discuss today in light of

2     where I would like to land?  Mr. Dewey?

3          **MR. DEWEY:**  Nothing from us, Your Honor.  Thank

4     you.

5          **THE COURT:**  Okay.

6          **MR. BERHANE:**  Nothing else, Your Honor.

7          **THE COURT:**  Okay.  Thank you, all.

8          (Proceedings concluded at 1:38 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9      _____February 25, 2024_____     ___/s/__Lorraine T. Herman____
10              **DATE**                        **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25